Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
Sonum Dixit #353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

*Attorneys for Plaintiffs and the the Proposed Classessees*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN DOE and JOHN DOE II, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HIMS & HERS HEALTH, INC.<br><br>Defendant. | Case No.: 3:26-cv-07941<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs John Doe and John Doe II, individually and on behalf of all others similarly situated, assert the following against Defendant Hims & Hers Health, Inc. ("Hims & Hers"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1. Hims & Hers operates a consumer-facing health and wellness platform through which consumers can connect to licensed healthcare professionals, receive telehealth services,

prescription health and wellness products, and tailored treatment plans.[1]

2. Consumers can access these services through Hims & Hers websites (available at https://www.forhers.com/ and https://www.hims.com/) and mobile applications (collectively, the "Hims & Hers Platform").

3. Receiving medical treatment, and prescriptions, through the Hims & Hers Platform mirrors the process at "an in-person doctor's office."[2] It begins with an "intake process" in which consumers/patients must disclose "their symptoms, health history, and treatment goals" as well as complete an "identity verification process."[3]

4. The results of this intake process are reviewed by a "licensed healthcare provider" who then issues a prescription for the consumer/patient if necessary.[4] A primary selling point of Hims & Hers services is that they are "discreet[]" including in how they ship prescriptions directly to consumers.[5] After receiving their prescription, consumers/patients can continue communicating with their "care team" on the Hims & Hers Platform.[6]

5. Given the nature of this information shared through the Hims & Hers Platforms, Plaintiffs and Class Members believed their personal information, including health information, would not be shared or disclosed.

6. Unbeknownst to Plaintiffs and Class Members, this sensitive personal information communicated through the Hims & Hers Platform, including health information relating to the completion of the medical intake forms, was disclosed to and intercepted by some of the largest advertising and social media companies in the country, including Meta Platforms, Inc. ("Meta"), Google, LLC ("Google"), Snap Inc. ("Snap"), and Amplitude, Inc. ("Amplitude").

7. Hims & Hers disclosed, and allowed third parties to intercept, this data through

---

[1] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited July 30, 2026).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

tracking technology incorporated on the Hims & Hers Platform, including software development kits ("SDK") and tracking pixels (collectively, "Tracking Technologies"). Hims & Hers incorporated Tracking Technology from a number of third parties—which itself demonstrates this was not by accident—including, in addition to the above, Pinterest, Inc., Microsoft Corporation, through its Bing services, Datadog, Inc., Reddit, Inc., Stripe, Inc., Branch Metrics, Inc., and Braze, Inc. (collectively, "Advertising and Analytics Companies").

8. This information was not aggregated or deidentified, nor were the Advertising and Analytics Companies prohibited from using this information for their own benefit. For instance, Google, Meta, and Snap use this information for their own purposes, including to train their own ads delivery and personalization systems.

9. Each of the Plaintiffs and Putative Class Members provided their personal information, including health data relating to their medical conditions and medication history, to Hims & Hers with the expectation that this information would remain confidential and private.

10. The disclosure and interception of this information without consent constitutes an extreme invasion of Plaintiffs' and Class Members' privacy. Given the secret and undisclosed nature of Defendant's conduct, additional evidence supporting Plaintiffs' claims, including the full extent of medical information intercepted and how that information was used, will be revealed in discovery.

## PARTIES

### A. Plaintiffs

11. **Plaintiff John Doe** is a resident of Port Hueneme, California.

12. Plaintiff John Doe used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

13. To use the Hims & Hers Platform, Plaintiff John Doe was required to disclose his name, email, address, and other personal information. He was also required to complete an online

intake, in which he communicated to Hims & Hers information about his symptoms and medication history. Plaintiff John Doe paid for these services.

14. Unbeknownst to Plaintiff John Doe, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his personally identifiable information ("PII") and health data on the Hims & Hers Platform.

15. Plaintiff John Doe did not consent to the sharing and interception of his data, or the use of this information by Hims & Hers or Advertising and Analytics Companies. Had Plaintiff John Doe known Hims & Hers would share his PII, health information, and other sensitive data with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his information with Hims & Hers.

16. **Plaintiff John Doe II** is a resident of Sacramento, California.

17. Plaintiff John Doe II used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

18. To use the Hims & Hers Platform, Plaintiff John Doe II was required to disclose his name, email, address, and other personal information. He was also required to complete an online intake, in which he communicated to Hims & Hers information about his symptoms and medication history. Plaintiff John Doe II paid for these services.

19. Unbeknownst to Plaintiff John Doe II, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his PII and health data on the Hims & Hers Platform.

20. Plaintiff John Doe II did not consent to the sharing and interception of his data, or the use of this information by Hims & Hers or Advertising and Analytics Companies. Had Plaintiff John Doe II known Hims & Hers would share his PII, health information, and other sensitive data with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his information with Hims & Hers.

**B. Defendant**

21. **Defendant Hims & Hers Health, Inc.** is a Delaware corporation with its principal place of business at 2269 Chestnut Street, #523, San Francisco, California.

22. Hims & Hers knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the Hims & Hers Platform without consumers' consent, including SDKs and tracking pixels.

23. The Advertising and Analytics Companies developed each of these tracking technologies for the express purpose of collecting data from users for, among other things, marketing, analytics, and advertising purposes.

24. Hims & Hers knew at the time it incorporated this software into the Hims & Hers Platform that it would result in the disclosure and interception of users' interactions on the Hims & Hers Platform, including PII, health information, and other identifiable information, by virtue of how these technologies function and the analytics and insights they received as a result.

25. For example, Meta allows website and app developers, like Hims & Hers, to use the Meta Pixel and its SDK with access to the data collected from their users and provides them with tools and analytics to leverage that information to reach these individuals through Facebook ads.

26. Indeed, Hims & Hers created, at least, audiences with Meta on the Meta Platform that correlate to its disclosure of health data to this entity. Accordingly, it was well aware of the data it disclosed and allowed the Advertising and Analytics Companies to intercept.

27. Despite this, Hims & Hers continued to incorporate the Advertising and Analytics Companies' technologies into the Hims & Hers Platform and reap their benefit, including by increasing its overall revenue through advertisements and by improving the Hims & Hers Platform. As such, Hims & Hers's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class Members.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class Members are citizens of a state different from Hims & Hers.

29. This Court also has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert a claim arising under the laws of the United States, namely the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.

30. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

31. This Court has personal jurisdiction over Hims & Hers because its principal place of business is in California and a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including the interception and use of Plaintiffs' sensitive health data from the Hims & Hers Platform and use of that data for commercial purposes.

32. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Hims & Hers is headquartered in this District and subject to personal jurisdiction in this District.

33. **Divisional Assignment**: This action arises in San Francisco County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Francisco County. Pursuant to L.R. 3-2(d), all civil actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

### A. The Hims & Hers Platform

34. Andrew Dudum, Jack Abraham, and Hilary Coles launched Hims & Hers.[7] The company was founded in 2017 and is now a publicly traded "telehealth platform" (NYSE: HIMS).[8] The "Hims" web and mobile properties are tailored to providing men's health treatment, whereas the "Hers" web and mobile properties are targeted at women.

35. Hims & Hers boasts that it provides a "comprehensive, personalized approach to healthcare, connecting customers with licensed healthcare providers who evaluate each individual's needs and recommend personalized treatment plans."[9] It provides access to telehealth services, consultations, and prescription medications through the Hims & Hers Platform. The types of health treatment available on the Hims & Hers Platform include sexual health, hair loss, hormone health, weight loss, dermatology, mental health, and laboratory testing.[10]

36. Below, in Figure 1, is an example of the marketing materials on the Hims web property relating to testosterone treatment:

[7] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited July 30, 2026).
[8] *Id.*
[9] *Id.*
[10] FORM 10-K, HIMS & HERS, https://www.sec.gov/Archives/edgar/data/1773751/000177375126000022/hims-20251231.htm?

**FIGURE 1**




37. To obtain these telehealth services and/or a prescription, consumers/patients must complete an intake consultation that collects information about their symptoms, health history, and treatment goals. The intake questionnaires are tailored to the specific type of health service sought by the consumer/patient, but each involve the collection and disclosure of health information.

38. For instance, as depicted in Figure 2 below, the Hims & Hers Platform questionnaire for testosterone treatment asks, at least: (1) which areas of your health are you looking to improve?; (2) have you ever had your testosterone levels tested?; (3) When did you start noticing changes?; (4) how often do these changes get in the way of your day-to-day life?; (5) how do you feel about starting treatment?; (6) select the state you live in; (7) provide your date of birth.

**FIGURE 2**




39. After answering these questions, consumers/patients are prompted to create an account, providing their email address and password. The questionnaire then continues, as depicted in Figures 3 and 4 below, asking at least (1) are you currently being treated for low testosterone with prescription medication?; (2) if yes, why did you start testosterone treatment?; (3) symptoms; (4) whether they have lab results showing low testosterone; (5) what treatments they are currently taking for testosterone; (6) if they would like to switch treatment; (7) why they are interested in Hims; (8) do you have low sex drive; (9) difficulty getting or keeping a hard erection; (10) how they would rate how hard their erection is; (11) if their physical strength or endurance is lower than it should be; (12) if they need naps; (13) if they have low energy levels; (14) brain fog or feel less mentally sharp; (15) if they struggle with motivation; (16) have sad or depressed moods; (17) have thought, in the last two weeks, if they were better off dead or had thoughts of hurting themselves; (18) if they find preserving their fertility important; (19) are they able to walk briskly for 10 minutes or do light yard work without stopping because of physical symptoms; (20) had lightheadedness, fainting, or near fainting in the last six months; (21) enlargement of breast tissue from unrelated weight gain; (22) if they have been diagnosed or prescribed medication for heart conditions, high blood pressure,

diabetes, high cholesterol, DVT or PE, blood clotting disorder, liver disease, hepatitis, abnormal liver test, eye problems, vision loss, unusual eye anatomy, endocrine system dysfunctions, or cancer; (23) whether they've been diagnosed or prescribed medication for an additional ten health conditions, such as sleep apnea or kidney problems; (24) if they have any other medical conditions; (25) if they take tadalafil every day; (26) if they've taken it in the past; (27) if they have an active prescription for erections or sexual function; (28) if they take oral finasteride or oral dutasteride currently or previously; (29) if they take vitamins or supplements; (30) if they take steroids or have in the last six months; (31) if they've taken recreational drugs in the past six months; (32) their height and weight; (33) if they have allergies; (34) if they had any surgeries or medical procedures; and (35) their sex at birth.

**FIGURE 3**



**FIGURE 4**




40. After completing this lengthy questionnaire, Hims & Hers summarizes the results and lets the consumer/patient know that a "licensed provider will review your symptoms and blood test results to find the right treatment for you," as shown in Figure 5 below.

**FIGURE 5**




41. In the above example, after completing the questionnaire Hims & Hers recommended Testosterone Rx+ for $99/month if paid upfront for a ten-month plan. It then prompted the consumer/patient to provide their full name, address, and phone number to ship a test kit. Completing this process then triggers Hims & Hers identity verification, which requires the last four digits of the consumer/patient's Social Security Number and a photo of their face or a copy of their ID.

42. After completing the entire process, the intake questions and answers are reviewed by a licensed healthcare provider, as well as any required tests/labs, who can provide a prescription, where necessary, that is "discreetly" shipped directly to the consumer. [11]

43. Each of the telehealth/prescription services provided through Hims & Hers follows a similar format and requires the disclosure of health information.

**B. Hims & Hers Promises to Users**

44. Of course, consumers expect their communications with Hims & Hers to remain confidential. This is because this information, including health data like whether a person is experiencing erectile dysfunction or needs certain medication, is highly sensitive and private.

45. Given this expectation of privacy in this type of sensitive information, it is unsurprising that Hims & Hers assured users this information would remain confidential.

**<u>FIGURE 6</u>**[12]

## Commitment to patient privacy and data security

At Hims & Hers, protecting our customers' privacy is our top priority.

Here's how:

- **Hims & Hers protects customer data.** We protect customer data with robust security practices that meet or exceed industry standards. All personal information is encrypted, stored securely, and handled with the highest levels of care and confidentiality.
- **Hims & Hers is designed with privacy in mind.** We are committed to respecting our customers' data by implementing a privacy-by-design approach and abiding by data minimization principles.
- **The customer is in charge.** Customers can visit privacy.hims.com at any time to view, correct, delete, limit the use of their sensitive personal data, or opt out of the sale of personal data.

Hims & Hers adheres to all applicable privacy laws and will always be transparent about collecting and using customer data.

For more details, view our Privacy Policy.

---

[11] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited July 30, 2026).
[12] *Id.*

46. As noted above in Figure 6, Hims & Hers boasts that it "protects" customer data and, in fact, meets or exceeds industry standards, has designed its platform with privacy in mind, and adheres to privacy laws.

47. Hims & Hers's privacy policy reinforces this notion, stating that "any medical or health information that you provide that is subject to specific protections under applicable state laws (collectively, with PHI, "**Protected Information**"), will be used and disclosed only in accordance with such applicable laws."[13] The policy further states "we do not use Protected Information for advertising or marketing."[14]

48. Hims & Hers Medical Group's Notice of Privacy Practices makes similar promises, stating "Other than expressly provided herein, any other uses or disclosures of your medical information will require your specific written authorization."[15]

49. A recent Complaint for Permanent Injunction, Monetary Judgment, Civil Penalty Judgment, and Other Relief filed against Hims & Hers on behalf of the Federal Trade Commission, the People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison and the Utah Division of Consumer Protection (hereinafter, "FTC Complaint")[16] details additional privacy promises and representations made by Hims & Hers.

50. The FTC Complaint states that, until at least August 2023, the Hims website represented, in response to "How does Hims ensure patient privacy?" that "medical records and sensitive information are only accessed by the medical providers managing your care."[17]

---

[13] *Privacy Policy*, HIMS & HERS HEALTH, INC., https://www.hims.com/privacy-policy (last updated March 26, 2026).

[14] *Id.*

[15] *Hims & Hers Medical Groups Notice of Privacy Practices*, https://www.hims.com/notice-of-privacy-practices (last visited July 30, 2026).

[16] *Federal Trade Commission v. Hims & Hers Health, Inc.*, No. 3:26-cv-7871 (N.D. Cal. July 29, 2026).

[17] FTC Complaint ¶ 62.

51. The FTC Complaint also alleges that in online advertisements, Hims & Hers stated that it provides a "100% online, private, and secure process."[18] The Complaint further states that Hims & Hers made similar representations in offline advertisements. [19]

52. Given these representations and the types of services Hims & Hers provides, users like Plaintiffs and Class Members expected their data, including health information, and other interactions on the Hims & Hers Platform, to remain confidential.

53. Unfortunately, Hims & Hers's assurances were false. Despite these promises, Hims & Hers disclosed and allowed third parties to intercept highly sensitive personal and medical information that Plaintiffs and Class Members entered on the Hims & Hers Platform.

54. In addition, Hims & Hers disclosed, and allowed third parties to intercept, unique advertising and persistent identifiers linked to individual Hims & Hers users in the same transmission of their health information. These identifiers are a set of unique data points (typically numbers and letters), akin to a Social Security number, that can individually identify one specific individual across all the apps and websites they use, allowing them to be tracked over time and across devices (e.g., smart phones, tablets, laptops, desktops, etc.).

55. Hims & Hers knew that it disclosed and allowed third parties to intercept its users' sensitive personal information, including health data. Indeed, according to the FTC Complaint, Hims & Hers created "Events" that were sent to, at least, Meta that were configured in a way that disclosed health information. Only Hims & Hers could configure those events.[20]

## C. Background on Tracking Technology

56. Pixels are one of the more common forms of Tracking Technology used by website operators to track users' behavior, interactions, and the content of their communications online.

57. Pixels are typically snippets of code embedded on a website that surreptitiously intercept a user's actions, including private communications on that app or property.

---

[18] *Id.* ¶ 63.
[19] *Id.* ¶ 65.
[20] *Id.* ¶ 67.

58. Pixels can collect a shocking amount of private information regarding an individual's online communications, including their searches, queries, what content they select and view, what they enter into online forms, and their habits and behaviors.

59. Web developers, like Hims & Hers, can use pixels to send additional information specific to their website. As described herein, Hims & Hers configured the pixels at issue in this case to transmit and intercept consumers'/patients' health data alongside personally identifiable information.

60. As the Federal Trade Commission ("FTC") explains, one of the purposes of using pixels is to monetize consumers' data:

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[21]

Particularly problematic, consumers have no way of knowing these pixels are present because they are invisible. The FTC further warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with . . . .[22]

61. Software Development Kits function in the same manner but merely exist to share information with third parties on mobile applications as opposed to websites.

---

[21] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION, (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

[22] *Id.*

62. As described below, Hims & Hers used Tracking Technology provided by at least Google, Meta, and Snap. Plaintiffs and Class Members had no way of knowing Hims & Hers used this Tracking Technology or that their private data would be used and intercepted as a result.

63. Especially problematic, Meta, Google, and Snap are some of the largest advertising platforms in the world. Each of these entities uses the intercepted information for their own commercial purposes, including to augment the profiles they maintain about individuals, and improve their technology for targeting individuals with ads both on properties they own and operate (e.g., Facebook, Instagram, Google.com, or the Snapchat apps) and other web properties that participate in their respective ad networks.

**D. Meta's Tracking Technology on the Hims & Hers Platform**

64. Meta operates the world's largest social media company and generated $164 billion in revenue in 2024, almost all of which comes from advertising. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.

65. In conjunction with its advertising business, Meta encourages and promotes entities and web property owners, such as Hims & Hers, to utilize its "Business Tools" to gather information about people, identify, target, and market products and services to them.

66. One such Business Tool is the Meta Pixel. Upon its release in 2015, Meta touted Meta Pixel as a new way to gain insights about how people use your website. The "pixel" itself is a small snippet of website code written by Meta engineers. To use the Meta Pixel, an advertiser places a pixel (i.e., a code snippet) on their website.

67. The Meta Pixel is designed to "track[] the people and type of actions they take" across all pages accessible on a web property with a single code snippet.[23] When a user accesses a webpage on a web property using the Pixel, their communications with *every* webpage are instantaneously and surreptitiously intercepted and recorded by Meta's code and sent to Meta's servers.

---

[23] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last visited January 14, 2026).

68. Through this technology, Meta intercepts information about each page a user visits, what buttons they click, as well as specific words they type into form boxes (e.g., when applying for admission, signing up for a class, or searching) on the web property. Meta also receives "events" data reflecting data fields identified by the web property owner, which can reveal even more information about the individual and their specific interactions or communications.

69. The information Meta receives via the Meta Pixel includes identifying information that is sufficient to identify a particular individual either directly (e.g., by name or email) or in combination with other information, like unique device identifiers, cookie values, and IP addresses, already in Meta's possession (e.g., either because it was collected from another web property using its Tracking Technology or the individuals' use of a Meta owned and operated app or property).

70. For instance, Meta uses "[a]dvanced matching" techniques to link the data received via the Meta Pixel to Facebook users[24] and also analyzes information entered in online forms to uncover further PII about the user, such as their email address, to further identify each respective individual.[25]

71. Meta stores the data captured by its Tracking Tools on its own servers for its own commercial purposes. Meta then provides the web property owner whose property this information is recorded from with access to analytics generated from the data recorded (e.g., which users took certain actions on any given webpage, how many, etc.). This is accessed through the web property owner's Facebook Ads Manager account, as well as potentially through the Facebook Events Manager.[26] The data available to the web property owner is a limited set and *does not* include all information Meta has about the individuals whose communications and actions it recorded through its Tracking Technology.

---

[24] *Advanced Matching*, META https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last visited January 26, 2026).

[25] *About advanced matching for web*, META https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last visited January 26, 2026).

[26] *Conversion Tracking*, META https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited January 26, 2026).

72. In this way the Meta Pixel has two purposes: (1) it enriches Meta's ability to collect data about individuals across the web, and enriches its profiles about them, and (2) facilitates web property owners spending money on Meta ads. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel to target them directly with ads. Meta also uses this audience to "identify other Facebook users" similar to them (i.e., "lookalikes") and to "target [those similar users] with [the website owner's] ads."[27] Meta uses the full complement of data in its possession—not just that received from the web property—to identify these individual targets.

73. Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's documentation confirms that Meta feeds the data received through the Meta Pixel into "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative.[28] These machine learning models "learn[]" more about individuals as they "receive[] new data."[29] Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's ad revenue. And individual consumers who have their data disclosed by one entity (for instance, Hims & Hers) will see ads for other entities based on their data as a result of Meta's advertising system.

74. In true "move fast and break things" spirit, Meta built these systems to sell ads without incorporating any way to limit the use of data collected through Meta Pixel, or prevent Meta Pixel from acquiring sensitive data. According to leaked internal Meta documents, Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use

---

[27] *Id.*

[28] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.

[29] *Id.*

X data for Y purpose.'" Thus, any data the Meta Pixel intercepted from Hims & Hers Platform was incorporated into Meta's ads systems and models to benefit its business.

75. Meta's customers, like Hims & Hers, can also send data to Meta through a server-to-server connection or through a third-party intermediary (e.g., sending data to a data platform like AppsFlyer or mParticle which then routes traffic to Meta and others). This allows customers like Hims & Hers to disguise what data it sends to Meta because no one (other than these parties) can observe what data Hims & Hers uploads directly to Meta for use in ads, or sends through third parties. Which data Hims & Hers uploaded to Meta directly or sent through third parties and how that data is used, accordingly, will be uncovered during discovery.

76. Hims & Hers uses Meta's Tracking Technology on the Hims & Hers Platform. As a result, Hims & Hers disclosed, and Meta intercepted, Plaintiffs' and Class Members' interactions on the Hims & Hers Platform. Meta received at least first party and third party cookies, other identifiers, and custom events.

77. According to the FTC Complaint, the events shared with Meta conveyed "consumers' health information."[30] This information was shared directly through the Meta Pixel, as well as Meta's Conversions API, i.e., the process of sending data through a sever-side connection. [31] Hims & Hers used this data to create audiences used to target Plaintiffs and Class Members.[32]

78. Plaintiffs did not consent to the interception or disclosure of their data to Meta. Hims & Hers's disclosure, and Meta's interception, of Plaintiffs' PII, health data, and other information without their consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**E. Google's Tracking Technology on the Hims & Hers Platform**

79. Google is one of the largest digital advertiser platforms in the country, with a market capitalization of over $3 trillion. Google accounts for 26.8% of the total digital advertising revenue

---

[30] FTC Complaint ¶ 67.
[31] *Id.* ¶ 70.
[32] *Id.* ¶ 74.

generated in the United States.[33] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[34]

80. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [35]

81. Google offers various Tracking Technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products, increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing a direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

---

[33] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Oct. 23, 2025).

[34] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Oct. 23, 2025).

[35] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

82. Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[36]

83. Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code immediately intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and input into text fields.

84. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or to use a Google product. Google has a special set of cookies and systems created specifically to track and identify individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[37]

85. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads

---

[36] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Oct. 23, 2025).

[37] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

86. In addition to providing customers with analytics ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data Hims & Hers disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements. And individual consumers who have their data disclosed by one entity (for instance, Hims & Hers) will see ads for other entities based on their data as a result of Google's advertising system.

87. Further, customers like Hims & Hers can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like Hims & Hers to disguise what data it sends to Google because no one (other than these parties) can observe what data is sent server-side.

88. Hims & Hers uses Google's Tracking Technology on the Hims & Hers Platform. As a result, Hims & Hers disclosed, and Google intercepted, Plaintiffs' and Class Members' interactions on the Hims & Hers Platform. Google received at least first party cookies, other identifiers, browser information, full-string URLs that would disclose the types of questionnaires completed by Plaintiffs and Class Members, and thus health information, and event names revealing additional information, for example, that a consultation was started or the consumer/patient was signed in.

89. Plaintiffs did not consent to the interception or disclosure of their data to Google. Hims & Hers's disclosure, and Google's interception, of Plaintiffs' PII, health data, and other information without their consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**F. Snap's Tracking Technology on the Hims & Hers Platform**

90. Snap is a publicly traded company with over 900 million daily active users across the globe. As Snap admits in its filings with the SEC, "substantially all of [its] revenue" is generated from advertising, with 91% of its revenue in 2024 coming from ads.

91. As Snap also admits, its advertising business "rel[ies] heavily" on its "ability to collect, process, and disclose data" including "personal data" to advertisers and others.[38]

92. Like the other advertising giants above, Snap offers tracking tools, including the Snap Pixel, to collect information that feeds its advertising business.

93. The Snap Pixel (like other pixels) is a snippet of code placed on an advertiser's web property that tracks user actions as they interact with a website, including their actions and queries, such as viewing a particular webpage, making a purchase, and adding a specific item to their cart.

94. Snap "strongly" encourages its customers (i.e., web property owners) to send individual email addresses or phone numbers through the Snap Pixel so they can better target these individuals with ads, e.g., by joining the data intercepted with their Snap profile or other data in Snap's possession. In addition to these forms of PII, the Snap pixel also intercepts IP address, first and third-party cookies, and other browser information that helps to fingerprint users.[39] Snap uses this "variety of signals" to engage in "PII matching" and identify individuals.[40]

95. Snap uses this identifiable data, not only to serve ads on behalf of its customers, but for its own reasons. This includes training machine learning models, improving targeting capabilities, creating custom and "look-alike" audiences and models, and for reporting purposes.[41]

96. In addition to the Snap Pixel, Snap also has a Conversions API, which allows customers, like Hims & Hers, to send data directly to Snap through a server-to-server integration.

---

[38] SNAP INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2024, https://www.sec.gov/Archives/edgar/data/1564408/000156440825000019/snap-20241231.htm?

[39] *Pixel Implementation FAQs*, SNAP, INC., https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited January 26, 2026).

[40] *Id.*

[41] *Id.*

Snap encourages customers to use these technologies together, which avoid detection because no one other than Snap and its customer can observe what data is sent through this connection.[42] As with other upload only and third party data flows described above, which data Hims & Hers uploaded directly to Snap is exclusively in its possession and will be identified in discovery.

97. Hims & Hers uses Snap's Tracking Technology on the Hims & Hers Platform. As a result, Hims & Hers disclosed, and Snap intercepted, Plaintiffs' and Class Members' interactions on the Hims & Hers Platform. Snap received at least cookies, its own identifier and other identifiers, and events.

98. According to the FTC Complaint, the data shared with Snap conveyed "consumers' health information."[43] This information was shared directly through Snap's Tracking Technology and by uploaded list of additional data so that Snap can "match these users to their Snapchat accounts."[44] Plaintiffs' own investigation revealed that, in addition to event data, Snap received SHA256 hashed email addresses, which Snap uses to match users to their Snapchat accounts.

99. Plaintiffs did not consent to the interception or disclosure of their data to Snap. Hims & Hers's disclosure, and Snap's interception, of Plaintiffs' PII, health data, and other information without their consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**G. Other Tracking Technologies on the Hims & Hers Platform**

100. Hims & Hers incorporated a host of other third parties' Tracking Technologies on the Hims & Hers Platform. According to the FTC Complaint, Hims & Hers also incorporated Tracking Technologies from: Microsoft (Bing Pixel and Bing Image Pixel); Criteo (Criteo Pixel); MediaBids.com (MediaBids Pixel); PartnerCentric (PartnerCentric Pixel); PebblePost.com (PebblePost Pixel); Pinterest (Pinterest Pixel); Podsights (now known as Spotify Ad Analytics -

---

[42] *Snap Pixel: Power Your Ad Performance*, SNAP, INC., https://forbusiness.snapchat.com/advertising/snap-pixel? (last visited January 26, 2026).

[43] FTC Complaint ¶ 76.

[44] *Id.*

Podsights_iHeartMedia Pixel); Reddit (Reddit Pixel); StackAdapt (StackAdapt Pixel); TikTok (TikTok s2s Pixel); the Trade Desk (Trade Desk Pixel); and X (formerly known as Twitter - Twitter Pixel).

101. In addition to the tracking technologies identified by the FTC, Plaintiffs' investigation detected Tracking Technologies offered by Amplitude, Datadog, Stripe, Branch, and Braze on Hims & Hers's websites or mobile application.

102. At least one of these companies, Amplitude, also received PII and health information through Hims & Hers's incorporation of Tracking Technologies on the Hims & Hers Platform.

103. For instance, on the mobile application, Amplitude received AAID, user ID, device information, a device identifier, and event names that reveal the type of treatment sought (i.e., mental health, weight loss, etc.). On the website, Amplitude received user and device identifiers, the Meta "fbp" cookie, and data revealing the type of questionnaire and treatment sought (for instance, "consultation/hair-loss"), as well as actual survey answers.

**<u>FIGURE 7</u>**


```
    "page": "hair_goals",
    "page_session_id": "d8185c96-ebe3-4542-8816-d17f560d7ef6",
    "raw_page": "hair_goals",
    "selected_choices": [
      "Experiencing hair loss, ready to start treatment ASAP"
    ],
    "selected_choices_one_line": "Experiencing hair loss, ready to start treatment ASAP",
    "server_unique_id": "9bbf6527-3df3-465e-9810-67c53533bbdc",
    "visit_type": "HAIR_LOSS",
    "zeus": "true"
  },
  "event_type": "visit:selected_visit_use_case",
  "group_properties": {
```


104. Every time Hims & Hers disclosed users' PII, health data, and other sensitive information to a third party through the technology incorporated in the Hims & Hers Platform, and those third parties intercepted users' data, it constituted a separate invasion of Plaintiffs' and Class Members' privacy and violation of the law.

**H. The Data Disclosed to Advertising and Analytics Companies Uniquely Identified Each Specific Class Member, Including Plaintiffs**

105. Meta, Snap, and Google provide customers like Hims & Hers with one or more unique identifiers precisely so each individual whose data is sent through the Tracking Technology can be identified and targeted. For example, customers like Hims & Hers can send data to Meta alongside Meta-specific cookies, including the "fbc" cookie which is a first-party cookie containing a Facebook click identifier, and the c_user, fr, and datr cookies, all of which are an individual's Facebook User ID or linked to that unique identifier.[45]

106. Similar to the above, Google has its own collection of cookies, including the "ide" DoubleClick cookie, the "cid" cookie, and "sid" cookie. Meanwhile, Snap uses its own "u_sclid" identifier. These cookies all serve the same purpose—to uniquely track and identify consumers.

107. In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person, much like the Government knows which specific person is associated with each social security number. Through these identifiers, Meta, Snap, and Google know which specific person is associated with each of their unique identifiers.

108. Google, Meta, and Snap are especially able to identify individuals who have accounts with them. A remarkable number of Americans possess a Google, Meta, or Snap account. One-third of Americans have accounts with Google's Gmail e-mail client; over 80-percent of Americans use YouTube, Google's video client; over 70-percent report using Facebook, and a quarter use

[45] Meta also uses the "fbp" cookie which can act as a fallback to identify individual users when other cookies are unavailable.

Snapchat.[46] When these users visit a website, like the Hims & Hers Platform, that utilizes these companies' Tracking Technologies, any information collected by the Pixels can be linked to the user's respective accounts with these entities through identifiers and other means.

**I. Plaintiffs and Class Members Do Not Consent to Hims & Hers's Conduct**

109. Plaintiffs and Class Members had no way of knowing that Hims & Hers was disclosing, and the Advertising and Analytics Companies were intercepting, their communications when interacting with the Hims & Hers Platform, because their software is inconspicuously incorporated in the background.

110. This conduct is all the more egregious given the nature of the information entered into the Hims & Hers Platform, e.g., PII, requests for prescriptions, and identifiable medical information, among other things. Plaintiffs and Class Members would not expect this information would be disclosed or intercepted without their consent.

111. This is especially true given Hims & Hers's consistent representations that this information would remain private and confidential.

**J. Plaintiffs and Class Members have a Reasonable Expectation of Privacy in their User Data**

112. Plaintiffs and Class Members have a reasonable expectation of privacy in their communications on the Hims & Hers Platform, including their health information.

113. Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

---

[46] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, PEW RESEARCH (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited Mar. 4, 2026).

114. For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

115. Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

116. Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.[47]

117. Other privacy law experts have expressed concerns about the disclosure to third parties of users' intimate health data. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increasing the rate you're charged on loans, and leaving you vulnerable to workplace discrimination.

[47] DATAGRAIL, *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/ (last visited Mar. 13, 2026).

118. Hims & Hers's surreptitious disclosure and interception of Plaintiffs' and Class Members' private communications, including PII, health information, and other sensitive data violates Plaintiffs' and Class Members' privacy interests.

119. The data Hims & Hers disclosed and the Advertising and Analytics Companies intercepted is also extremely valuable. According to Experian, health data is a "gold mine" for healthcare companies and clinicians.[48]

120. Consumers' health data, including what prescriptions they have, is extremely profitable. For instance, Datarade.ai advertises access to the names, addresses, email addresses, and telephone numbers of U.S. customers who bought brand-name medicine. The starting price for access to just some of this data was $10,000. Other companies, like Pfizer, spend $12 million annually to purchase health data and the medical data industry itself was valued at over $2.6 billion back in 2014.

121. Hims & Hers monetized and used the data collected from Hims & Hers users to serve personalized advertisements, including through audiences on the Meta platform. This further compounds Hims & Hers's privacy violations.

## TOLLING, CONCEALMENT, AND ESTOPPEL

122. The applicable statutes of limitation have been tolled as a result of Hims & Hers's knowing and active concealment and denial of the facts alleged herein.

123. Hims & Hers secretly incorporated the Advertising and Analytics Companies' software into the Hims & Hers Platform, providing no indication to users that they were interacting with sites that shared their data, including PII and health data, with third parties.

124. Hims & Hers had exclusive knowledge that the Hims & Hers Platform incorporated the Advertising and Analytics Companies' software, yet failed to disclose that fact to users, or that

[48] *Healthcare data: the value of historical patient data*, EXPERIAN HEALTH (JUN. 16, 2022), https://www.experian.com/blogs/healthcare/healthcare-data-the-value-of-historical-patient-data/ (last visited July 30, 2026).

by interacting with the Hims & Hers Platform Plaintiffs' and Class Members' sensitive data, including PII and health data, would be disclosed to and intercepted by third parties.

125. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Hims & Hers's conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that Hims & Hers was disclosing, and third parties were intercepting, data from the Hims & Hers Platform.

126. The earliest Plaintiffs and Class Members could have known about Hims & Hers's conduct was shortly before the filing of this Complaint.

127. Hims & Hers was under a duty to disclose the nature and significance of its data collection practices but did not do so. Hims & Hers is therefore estopped from relying on any statute of limitations under the discovery rule.

128. Additionally, Hims & Hers engaged in fraudulent conduct to prevent Plaintiffs and Class Members from discovering the disclosure and interception of their data. Hims & Hers misled Plaintiffs and Class Members to believe their data, including health data and PII, would not be disclosed or intercepted.

129. Plaintiffs and Class Members were not aware that Hims & Hers disclosed and allowed for the interception of their data, including PII and health information.

130. Plaintiffs and Class Members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Hims & Hers's misconduct by virtue of their fraudulent concealment.

131. Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

132. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> **Nationwide Class:** All natural persons in the United States who used the Hims & Hers Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Companies.
>
> In addition, or in the alternative, Plaintiffs plead the following State Classes:
>
> **California Class:** All natural persons in the State of California who used the Hims & Hers Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Companies.

133. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) Hims & Hers, its subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Hims & Hers or its parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Hims & Hers's counsel.

134. **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals, and the members can be identified through Hims & Hers's records.

135. **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to, the following:

- Whether Hims & Hers violated Plaintiffs' and Class Members' privacy rights;
- Whether Hims & Hers's acts and practices violated the Common Law Invasion of Privacy;
- Whether Hims & Hers was unjustly enriched;
- Whether Hims & Hers's acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;
- Whether Hims & Hers's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

- Whether Plaintiffs and the Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and
- Whether Plaintiffs and the Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

136. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class. The claims of Plaintiffs and the members of the Class arise from the same conduct by Hims & Hers and are based on the same legal theories.

137. **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Hims & Hers has no defenses unique to any Plaintiff. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

138. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

139. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

140. California substantive laws apply to every member of the Class. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

141. Hims & Hers maintains its principal place of business in California and conducts substantial business in California, such that California has an interest in regulating Hims & Hers's conduct under its laws. Hims & Hers also selected California law as the law to govern all disputes with its customers in its terms of service.

142. The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes, and California has a greater interest in applying its laws here given Hims & Hers's location and the location of the conduct at issue than any other interested state.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation Of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510, *et seq*.**
**(on behalf of Plaintiffs and the Nationwide Class)**

143. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

144. The ECPA prohibits the intentional interception of or procuring another person to intercept the contents of any electronic communication and the use of information obtained through the interception of any electronic communication. 18 U.S.C. § 2511.

145. The ECPA protects both the sending and receipt of communications.

146. The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

147. At all relevant times, Hims & Hers aided, employed, agreed with, conspired with, and procured third parties, including at least Meta, Google, and Snap, to track and intercept Plaintiffs' and Nationwide Class Members' internet communications while accessing the Hims & Hers Platform, and to use these intercepted communications. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and Nationwide Class Members.

148. The transmissions of data between Plaintiffs and Nationwide Class Members and Hims & Hers qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

149. Hims & Hers intentionally inserted an electronic listening device onto Plaintiffs' and Nationwide Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Hims & Hers to, at least, the Tracking Technologies described herein.

150. Hims & Hers willingly facilitated third parties' interception, recording, and collection of Plaintiffs' and Nationwide Class Members' private communications by embedding the Tracking Technologies on the Hims & Hers Platform and used the intercepted communications for its own analytics and advertising. Hims & Hers played an active role in the use of the third-party Tracking Technologies by customizing and deploying the third-party Tracking Technologies on the Hims & Hers Platform. Hims & Hers has full control over the Tracking Technologies, including which pages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

151. The Tracking Technologies constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

152. Hims & Hers failed to disclose its use of Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Nationwide Class Members' communications with Hims & Hers to undisclosed third parties.

153. The Tracking Technologies are designed such that they transmit a website or mobile application user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—Hims & Hers—before reaching Hims & Hers's server.

154. The third-party advertising companies that make these Tracking Technologies are not parties to Plaintiffs' and Nationwide Class Members' communications with Hims & Hers.

155. As demonstrated herein, Hims & Hers violated ECPA by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Hims & Hers Platform, and by then using these intercepted communications for its own analytics and advertising. Importantly, Meta, Google, and Snap would not have intercepted or received the contents of these communications (or even had access to them) but for Hims & Hers's actions and incorporations of the Tracking Technologies into the Hims & Hers Platform.

156. In aiding and permitting third parties to intercept its users' online communications, Hims & Hers had a purpose that was tortious. The unauthorized disclosure of private communications to profit from the information is tortious in and of itself. Hims & Hers intentionally committed a tortious act by disclosing private communications to third parties, allowing them to record individually identifiable health information without authorization to do so, and associating the content of Plaintiffs' and Nationwide Class Members' communications in a manner that exceeds what Hims & Hers disclosed to Plaintiffs and Nationwide Class Members.

157. In aiding and permitting third parties to intercept its users' communications, Hims & Hers had a purpose that was criminal and designed to violate state and federal constitutional and statutory provisions including:

- A knowing intrusion upon Plaintiffs' and Nationwide Class Members' seclusion;
- California Invasion of Privacy Act ("CIPA"); and
- Various state consumer protection statutes, including but not limited to the Unfair Competition Law.

158. Plaintiffs and Nationwide Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and any profits made by Hims & Hers as a result of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2520.

159. This includes monetary damages for the greater of (i) the sum of the actual damages suffered by the Plaintiffs and any profits made by Hims & Hers as a result of the violation, or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## SECOND CLAIM FOR RELIEF
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Class)**

160. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

161. A plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

162. Hims & Hers's disclosure of Plaintiffs' and Class Members' sensitive data, including PII and health information, to third parties like the Advertising and Analytics Companies constitutes an intentional intrusion upon Plaintiffs' and Class Members' solitude or seclusion.

163. Plaintiffs and Class Members had a reasonable expectation of privacy in the health information and other personal data that Hims & Hers disclosed to third parties. Plaintiffs' health information and other interactions with the Hims & Hers Platform are inherently sensitive in nature. Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

164. This expectation is especially heightened given Hims & Hers's consistent representations to users that this information would be safeguarded and not disclosed to third parties like Meta, Google, Snap, and other third parties.

165. Given Hims & Hers's representations, and the nature of the data Hims & Hers received, Plaintiffs and Class Members had a reasonable expectation of privacy in their data relating to their use of the Hims & Hers Platform and expected this information would not be disclosed.

166. Plaintiffs and Class Members did not consent to, authorize, or know about Hims & Hers's intrusion at the time it occurred. Accordingly, Plaintiffs and Class Members never agreed that Hims & Hers could disclose their data to third parties.

167. The surreptitious disclosure of sensitive data, including PII and health information from millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

168. The offensiveness of this conduct is all the more apparent because Hims & Hers's disclosure of this information was conducted in secret in a manner that Plaintiffs and Class Members would be unable to detect through the incorporation of highly technical SDKs and pixels that was contrary to the actual representations made by Hims & Hers.

169. As a result of Hims & Hers's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

170. Plaintiffs and Class Members have been damaged as a direct and proximate result of Hims & Hers's invasion of their privacy and are entitled to just compensation, including monetary damages.

171. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to

their privacy interests as well as a disgorgement of profits made by Hims & Hers as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

172. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Hims & Hers's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Hims & Hers from engaging in such conduct in the future.

173. Plaintiffs also seek such other relief as the Court may deem just and proper.

## THIRD CLAIM FOR RELIEF
**Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**(On behalf of Plaintiffs and the California Class)**

174. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Class.

175. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

176. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

177. The right to privacy in California's Constitution creates a right of action against private and government entities.

178. Plaintiffs and California Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, including their health information, pursuant to Article I, Section 1 of the California Constitution.

179. The identifiable and private information Hims & Hers disclosed to third parties without Plaintiffs' and California Class Members' consent was used, among other things, for

targeted advertising purposes. The manner in which Hims & Hers disclosed this information defeated established privacy mechanisms, including the CMIA and HIPAA, and social norms.

180. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there are third parties intercepting their PII and health information, let alone using it for profit.

181. Hims & Hers's conduct violated the privacy of hundreds of thousands of California Class Members, including Plaintiffs. Hims & Hers did not have consent to disclose this information.

182. Plaintiffs and California Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Hims & Hers as a result of its intrusion upon seclusion.

183. Hims & Hers's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and California Class Members' rights. Plaintiffs and California Class Members are entitled to punitive and exemplary damages.

184. Plaintiffs and California Class Members also seek any other relief the Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF
**Violation of California Confidentiality of Medical Information Act ("CMIA")**
**Cal. Civil Code Section 56.06**
**(On Behalf of Plaintiffs and the California Class)**

185. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

186. Hims & Hers is a provider of health care under Cal. Civ. Code Section 56.06, subdivisions (a) and (b), because the Hims & Hers Platform maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

187. Hims & Hers is also a provider of health care under Cal. Civ. Code Section 56.06, subdivisions (d) and (e) because it provides mental health digital services to consumers for the

purpose of diagnosis, treatment, and management and, separately, reproductive or sexual health digital services for the same purpose.

188. Hims & Hers is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

189. The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." As explained above, the information Hims & Hers maintained and disclosed is medical information because it is identifiable information relating to patients' medical histories, conditions, treatments, and/or prescriptions.

190. Hims & Hers violated Cal. Civ. Code Section 56.06(e) because it did not maintain the confidentiality of users' medical information. Hims & Hers disclosed Plaintiffs' and Class Members' medical information to third parties, including the Advertising and Analytics Companies without consent, including information concerning medications they were taking or were prescribed.

191. Hims & Hers shared this identifiable information with third parties, including Meta, Google, Snap, and other third parties whose primary business includes selling advertisements, analytics, or other insights based on the data they obtain about individuals, and using such data to improve their products, services, and algorithms.

192. Hims & Hers knowingly and willfully disclosed medical information without consent to Advertising and Analytics Companies for financial gain. Namely, to sell more products, advertise, obtain analytics, and improve the Hims & Hers Platform, in violation of Cal. Civ. Code Section 56.06(e). Hims & Hers's conduct was knowing and willful because it was aware that the Advertising and Analytics Companies would obtain all user data input while using its sites, yet intentionally embedded Advertising and Analytics Companies' Tracking Technologies anyway.

193. At the very least, Hims & Hers negligently disclosed medical information to Advertising and Analytics Companies in violation of Cal. Civ. Code Section 56.06(e).

194. Accordingly, Plaintiffs and Class Members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**FIFTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Cal. Civil Code Section 56.101**
**(On Behalf of Plaintiffs and the California Class)**

195. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

196. Cal. Civ. Code Section 56.101 (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

197. Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36[.]"

198. Hims & Hers is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information.

199. Hims & Hers failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed Plaintiffs' and Class Members' medical information, including information concerning medications they were taking or were prescribed, to third parties, including Advertising and Analytics Companies.

200. Hims & Hers's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Cal. Civ. Code Section 56.101 (a).

201. Accordingly, Plaintiffs and Class Members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SIXTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Cal. Civil Code Section 56.10**
**(On Behalf of Plaintiffs and the California Class)**

202. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

203. Cal. Civ. Code Section 56.10 (a) prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

204. Hims & Hers disclosed medical information without first obtaining authorization when it disclosed Plaintiffs' and Class Members' health data, including PII, to third parties, including the Advertising and Analytics Companies. No statutory exception applies.

205. Hims & Hers knowingly and willfully disclosed medical information without consent to Advertising and Analytics Companies for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise its services, in violation of Cal. Civ. Code Section 56.10, subdivision (a).

206. At the very least, Hims & Hers negligently disclosed medical information in violation of Cal. Civ. Code Section 56.10, subdivision (a) through the unauthorized disclosure of Plaintiffs' and Class Members' sensitive medical information.

207. Accordingly, Plaintiffs and Class Members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.35; and reasonable attorneys' fees and other litigation costs reasonably incurred.

**<u>SEVENTH CLAIM FOR RELIEF</u>**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Class)**

208. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Class.

209. The California Legislature enacted the CIPA, Cal. Penal Code §§ 630, *et seq*., finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

210. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

211. Hims & Hers is a person for purposes of § 631.

212. The Tracking Technologies and Plaintiffs' and California Class Members' computers and mobile devices are a "machine, instrument, contrivance, or . . . other manner" under § 631.

213. Under CIPA, a defendant must show it had the consent of all parties to a communication.

214. At all relevant times, Hims & Hers aided, employed, agreed with, and conspired with third parties, including at least Meta, Google, and Snap to track and intercept Plaintiffs' and California Class Members' internet communications while accessing the Hims & Hers Platform. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and California Class Members.

215. Hims & Hers intentionally inserted an electronic listening device onto Plaintiffs' and California Class Members' web browsers and devices that, without their knowledge and consent, tracked, intercepted, and transmitted the substance of their confidential communications with Hims & Hers to third parties, including Meta, Google, and Snap—who constitute "persons" within the meaning of the statute.

216. Hims & Hers willingly facilitated third parties' interception and collection of Plaintiffs' and California Class Members' PII and health information by embedding the Tracking Technologies on the Hims & Hers Platform. Hims & Hers has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

217. Hims & Hers failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and California Class Members' communications with Hims & Hers to undisclosed third parties.

218. The Tracking Technologies are designed such that they transmit a website or mobile application user's actions and communications contemporaneously as the user initiates each communication. These third parties immediately act on the communications in real time. As a result, the communications were intercepted in transit to the intended recipient—Hims & Hers—before reaching Hims & Hers's server.

219. As demonstrated above, Hims & Hers violated CIPA § 631 by aiding in and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Hims & Hers Platform. Importantly, Meta, Google, and Snap, and other unauthorized third parties would not have been able to intercept or receive the contents of these communications but for Hims & Hers's actions and incorporations of the Tracking Technologies into the Hims & Hers Platform.

220. By disclosing Plaintiffs' and California Class Members' PII and health information, Hims & Hers violated Plaintiffs' and California Class Members' statutorily protected right to privacy.

221. As a result of the above violations and pursuant to CIPA Section 637.2, Hims & Hers is liable to Plaintiffs and California Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

**EIGHTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiffs and the California Class)**

222. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Class.

223. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

224. § 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

225. Plaintiffs' and California Class Members' communications to Hims & Hers, including their PII and health information, were confidential communications for purposes of § 632,

because Plaintiffs and California Class Members had an objectively reasonable expectation of privacy in this data.

226. Plaintiffs and California Class Members expected their communications to be confined to Hims & Hers in part due to the protected nature of the information at issue. Plaintiffs and California Class Members did not expect Meta, Google, and Snap, or any third party to secretly eavesdrop upon or record this confidential information and their communications.

227. The Tracking Technologies are all electronic amplifying or recording devices for purposes of § 632.

228. Hims & Hers contemporaneously recorded and eavesdropped on Plaintiffs and California Class Members through electronic amplifying or recording devices, i.e., by using Meta, Google, and Snap's Tracking Technologies, in violation of § 632 of CIPA.

229. At no time did Plaintiffs or California Class Members consent to this conduct, nor could they reasonably expect that their communications would be overheard or recorded by third parties.

230. Meta, Google, and Snap each utilized Plaintiffs' and California Class Members' PII and health information for their own purposes, including for targeted advertising.

231. Plaintiffs and California Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

232. Plaintiffs and California Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and California Class Members' sensitive data has been collected, viewed, accessed, and stored by Hims & Hers, and third parties, including, Meta, Google, and Snap, has not been destroyed, and due to the continuing threat of such injury, Plaintiffs and California Class Members have no adequate remedy at law. Plaintiffs and California Class Members are accordingly entitled to injunctive relief.

**<u>NINTH CLAIM FOR RELIEF</u>**
**California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 638.50 & 638.51**
**(on behalf of Plaintiffs and the California Class)**

233. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Class.

234. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

235. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

236. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

237. Hims & Hers is a person under CIPA § 638.51.

238. Hims & Hers implemented and installed the Tracking Technologies—which are pen registers and/or trap and trace devices—on Plaintiffs' and California Class Members' devices and browsers.

239. These Tracking Technologies captured "routing, addressing, or signaling information" because they intercept unique user and device identifiers, including cookies used for purposes of identification.

240. Hims & Hers was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and California Class Members' routing, addressing, or signaling information as alleged herein.

241. Plaintiffs and California Class Members did not consent to Hims & Hers's installation of a pen register or trap and trace device on their devices or browsers.

242. Plaintiffs and California Class Members have been harmed as a result of Hims & Hers's conduct. Hims & Hers did not have authorization to use pen registers and/or trap and trace devices to surveil and identify Plaintiffs and California Class Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

243. Plaintiffs and California Class Members face an imminent threat of continued injury, as this data continues to be stored and used, including by third parties providing the Tracking Technology alleged above, such that Plaintiffs and California Class Members have no adequate remedy at law.

244. Plaintiffs and California Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the California Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

**TENTH CLAIM FOR RELIEF**
**Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**
**(On behalf of Plaintiffs and the California Class)**

245. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Class.

246. The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to [(including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

247. Plaintiffs' and California Class Members' devices on which Hims & Hers installed the third-party Tracking Technologies, including their computers, smart phones, and tablets, constitute "computer systems" within the meaning of the CDAFA. *Id.* § 502(b)(5).

248. The data that Hims & Hers accessed and disclosed from Plaintiffs' and California Class Members' devices constitutes "Data" within the meaning of the CDAFA. *Id.* § 502(b)(8).

249. Hims & Hers violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs' and California Class Members' devices and placing pixels, cookies, and other Tracking Technologies on their devices and local storage, in order to wrongfully obtain, disclose, and use their personal data in violation of users' reasonable expectations of privacy in their devices and data.

250. Hims & Hers violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the California Class Members' unique identifiers and other personal data from their devices.

251. Plaintiffs' and the California Class Members' device functionalities, device systems, device networks, and browsers constitute "computer services" within the meaning of the CDAFA. Hims & Hers violated § 502(c)(3) by knowingly and without permission causing them to be used and accessed by third parties through the third-party Tracking Technology and identifying mechanisms incorporated on the Hims & Hers Platform.

252. Plaintiffs' and California Class Members' devices, device systems, device networks, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. Hims & Hers violated § 502(c)(7) by knowingly and without permission causing those devices, device systems, device networks, and browsers to be accessed through third-party Tracking Technology and identifying mechanisms incorporated on the Hims & Hers Platform.

253. Hims & Hers violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and California Class Members, providing and/or assisting in providing advertisers, including Meta, Google, and Snap, the ability to access Plaintiffs' and

California Class Members' devices, device systems, device networks, and browsers via the Tracking Technology and identifying mechanisms incorporated on Hims & Hers Platform.

254. Under § 502(b)(12) of the CDAFA, a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." The Tracking Technology Hims & Hers incorporated on the Hims & Hers Platform constitutes computer contaminants as defined by § 502(b)(12) of the CDAFA. Hims & Hers violated § 502(c)(8) by knowingly and without permission introducing computer contaminants, including Google's Tracking Technology, on Plaintiffs' and California Class Members' devices, device systems, device networks, and browsers, which intercepted and disclosed their personal and health data to third parties. As described *supra*, the Tracking Technology is deeply hidden on the Hims & Hers Platform; Plaintiffs and California Class Members had no way to remove it or opt out of its functionality.

255. Plaintiffs and California Class Members suffered damage and loss as a result of Hims & Hers's conduct. Hims & Hers's practices have deprived Plaintiffs and the California Class Members of control over their valuable property (namely, their personal health data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiffs and California Class Members suffered harm because Hims & Hers unjustly profited from the PII and private data Hims & Hers disclosed by using it for its own business purposes, like targeted advertising. Hims & Hers's use of Tracking Technology has caused harm to Plaintiffs and California Class Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. Hims & Hers's practices have also violated Plaintiffs' and California Class Members' private interests by collecting and disclosing their PII and other private information.

256. Plaintiffs and California Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

257. Plaintiffs and California Class Members have also suffered irreparable and incalculable harm and injuries from Hims & Hers's violations. The harm will continue unless Hims & Hers is enjoined from further violations of this section. Plaintiffs and California Class Members have no adequate remedy at law.

258. Plaintiffs and the California Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Hims & Hers's violations were willful and, upon information and belief, Hims & Hers is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and California Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## ELEVENTH CLAIM FOR RELIEF
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On Behalf of Plaintiffs and the California Class)**

259. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

260. Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class.

261. Hims & Hers engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiffs and the Class Members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

262. For instance, Hims & Hers made representations that it would protect Plaintiffs' privacy interest, including its privacy policy's promise that "we do not use Protected Information for advertising or marketing."

263. Hims & Hers Medical Group's Notice of Privacy Practices likewise promised that "[o]ther than expressly provided herein, any other uses or disclosures of your medical information will require your specific written authorization."

264. Hims & Hers also represented on its website, in response to the question "How does

Hims ensure patient privacy?," that "medical records and sensitive information are only accessed by the medical providers managing your care," and advertised that it provides a "100% online, private, and secure process."

265. Hims & Hers made these representations with no intention of living up to these representations. Contrary to these representations, Hims & Hers disclosed and allowed third parties to intercept Hims & Hers users' sensitive data, including health data and PII.

266. Further, Hims & Hers failed to disclose it secretly shared, used, and allowed third parties to intercept Plaintiffs' and Class Members' sensitive data, including PII and health information.

267. Hims & Hers was under a duty to disclose this information given its relationship with Hims & Hers users and its exclusive knowledge of its misconduct (e.g., the Tracking Technology incorporated on the Hims & Hers Platform, the data it disclosed and allowed third parties to intercept through this technology, and how it and third parties used this data).

268. Plaintiffs and Class Members would not have purchased, or would have paid significantly less for, Hims & Hers's services and products had Hims & Hers not made these false representations. Hims & Hers profited directly from these sales, including through payment for these services and products, and from the data disclosed and intercepted.

269. Plaintiffs, individually and on behalf of the Class, seek an injunction requiring Hims & Hers to obtain consent prior to disclosing and otherwise using Plaintiffs' and Class Members' sensitive personal data and to delete the data already collected, and any other relief which the court deems proper.

270. Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs will serve Hims & Hers with notice of its alleged violations of the CLRA by certified mail return receipt requested. If Hims & Hers fails to provide appropriate relief for its violations of the CLRA within 30 days, Plaintiffs will seek monetary damages under the CLRA.

271. In accordance with Cal. Civ. Code § 1780(d), Plaintiffs' CLRA venue declarations are attached hereto.

**TWELFTH CLAIM FOR RELIEF**
**Violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiffs and the California Class)**

272. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein on behalf of the proposed California Class.

273. Hims & Hers's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"), because, as alleged above, Hims & Hers violated the California common law and other statutes and causes of action described herein.

274. Hims & Hers's business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Hims & Hers violated this public policy by, among other things, disclosing and intercepting Plaintiffs' and Class Members' sensitive data, including PII and health data, without consent.

275. Hims & Hers further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties, which deceived and misled users of the Hims & Hers Platform.

276. Hims & Hers's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Hims & Hers secretly disclosing, intercepting, and misusing Plaintiffs' and Class Members' sensitive personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs and Class Members were completely unaware of Hims & Hers's conduct, they could not have possibly avoided the harm.

277. Hims & Hers's business acts and practices are also "fraudulent" within the meaning of the UCL. Defendant Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, a large collection of sensitive personal data, including health information and PII, without disclosing this practice and therefore acted without users' knowledge or consent. Hims & Hers's business acts and practices were likely to, and did, deceive members of the public including Plaintiffs and Class Members into believing this data was private and would not be shared with third parties.

278. Hims & Hers assured users, in its privacy policy, that "we do not use Protected Information for advertising or marketing."

279. Hims & Hers did not disclose that it would share this data with third parties, including with Advertising and Analytics Companies.

280. Such information was not kept private, as Hims & Hers disclosed and allowed the Advertising and Analytics Companies to intercept this data.

281. Hims & Hers's violations were, and are, willful, deceptive, unfair, and unconscionable.

282. Had Plaintiffs and Class Members known their personal information, including health data and PII, would be disclosed and intercepted, they would not have used or purchased, or would have paid significantly less for, Hims & Hers services and products.

283. Plaintiffs and Class Members have a property interest in their sensitive personal data. By surreptitiously disclosing and intercepting Plaintiffs' and Class Members' information, Hims & Hers has taken property from Plaintiffs and Class Members without providing just or any compensation.

284. Health data objectively has value. Companies are willing to pay for this data, including the data disclosed to and intercepted by the Advertising and Analytics Companies. For instance, Pfizer annually pays approximately $12 million to purchase health data from various sources.

285. This data also objectively has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[49]

286. By unlawfully disclosing and intercepting this data, Hims & Hers has taken money or property from Plaintiffs and Class Members.

287. For these reasons, Plaintiffs seek at least restitution and other equitable relief on behalf of themselves and Class Members as a result of Hims & Hers's violations of the UCL.

**THIRTEENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

288. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

289. Hims & Hers received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense.

290. Hims & Hers received benefits from Plaintiffs and Class Members in the form of the Plaintiffs' and Class Members' highly valuable data, including health information and PII, that Hims & Hers wrongfully disclosed and intercepted from Plaintiffs and Class Members without authorization and proper compensation.

291. Hims & Hers disclosed, intercepted, stored, and used this data for their own gain, providing Hims & Hers with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

---

[49] Andrea Park, *How much should health data cost? $100K or more, according to patients*, BECKER'S HOSP. REV. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

292. Had Plaintiffs known of Hims & Hers's misconduct, they would not have provided any of their data to Hims & Hers and/or would not have paid for Hims & Hers services.

293. Hims & Hers unjustly retained these benefits at the expense of Plaintiffs and Class Members because Hims & Hers's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

294. The benefits that Hims & Hers derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in California and every other state for Hims & Hers to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

295. Hims & Hers should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Hims & Hers received, and such other relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Classes respectfully request that the Court enter an order:

A. Certifying the Classes and appointing Plaintiffs as the Classes' representatives;

B. Finding that Hims & Hers's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Hims & Hers;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper;

E. Awarding Plaintiffs and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F. Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

G. Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

Dated: July 30, 2026

/s/ *Amber L. Schubert*
Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
Sonum Dixit #353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Patricia Zapata Latzer (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
platzer@lowey.com